Michael S. Kogan (SBN 128500)
**KOGAN LAW FIRM, APC**
11835 W. Olympic Blvd., Suite 695E
Los Angeles, California 90064
Telephone (310) 954-1690
mkogan@koganlawfirm.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In re | ) Case No. 9:21-bk-10357-MB |
| | ) |
| PLAYER'S POKER CLUB, INC., | ) Chapter 11 |
| | ) |
| Debtor. | ) **DECLARATION OF PATRICK BERRY IN** |
| | ) **SUPPORT OF FIRST DAY EMERGENCY** |
| | ) **MOTIONS** |
| | ) |
| | ) **Date:      [TO BE SET]** |
| | ) **Time:** |
| | ) **Place:      Courtroom 201** |

**<u>DECLARATION OF PATRICK BERRY</u>**

I, Patrick Berry, hereby declare as follows:

1.      I am the General Manager of Player's Poker Club, Inc. dba Players Casino (the

"**Debtor**"), the debtor and debtor in possession herein in this bankruptcy case. Except where

1  otherwise stated below, I have personal knowledge of the facts set forth below and, if called as a

2  witness, I would and could competently testify thereto.

3      2.    In my capacity as the General Manager of the Debtor, I am responsible for, among

4  other things, supervising the Debtor's accounting and finance functions, including the preparation

5  of periodic financial statements and financial projections.  Either I or persons under my control

6  maintain the Debtor's financial books and records in the ordinary course of its business, in a

7  consistent and organized manner.

8      3.    To minimize the adverse effects of filing for chapter 11 protection on the date of

9  filing (the "**Petition Date**") and to enhance the Debtor's prospects of a successful reorganization,

10  the Debtor is filing a number of motions requesting various types of "first day" relief (collectively,

11  the "**First Day Motions**"). I am familiar with the contents of each First Day Motion (including the

12  exhibits and other attachments thereto), and I believe that the relief sought in each First Day

13  Motion: (i) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or

14  loss of productivity or value; (ii) is critical to the Debtor's achievement of a successful

15  reorganization; and (iii) best serves the Debtor's estate and the interests of the Debtor's creditors.

16  **The Debtor also requests that the Court allow service of the First Day Motions to be**

17  **accomplished by email, fax or personal service where practicable, or overnight mail as long**

18  **as the First Day Motions are overnighted only to parties that are likely to be adversary**

19  **affected by the granting of the motions**.

20      4.    I submit this declaration in support of the First Day Motions.  Except as otherwise

21  indicated, all statements set forth in this declaration are based upon: (i) my personal knowledge,

22  including my over 10 years of knowledge of the gaming industry, (ii) information supplied to me

23  by other members of the Debtor's management or its professionals, (iii) my review of relevant

24  documents, or (iv) my opinion based upon my experience and knowledge of the Debtor's

25  operations and financial condition. If I were called upon to testify, I could and would testify

26  competently to the facts set forth herein. I am authorized to submit this declaration.

27

28

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

5.    Part I of this declaration describes the Debtor's business, its capital structure, and the circumstances surrounding the commencement of this chapter 11 case. Part II sets forth the relevant facts in support of each First Day Motion.

## PART I

## OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

6.    The Debtor owns and operates a card room in Ventura County. Founded approximately 80 years ago, the casino has expanded from its humble start into its current position as an institution widely regarded throughout California. Over the course of its more than eight decades in business, the Debtors' combination of options for gaming and food services have offered many patrons a unique opportunity to enjoy a high quality gaming experience throughout the year.

7.    The Debtor offers a wide selection of gambling options, and is a nice friendly place to enjoy a day of poker and other card games in the only cardroom between Los Angeles and Lompoc. Located in Ventura, California, the Debtors' casino offers a wide variety of card games, including No Limit Hold'em, 21st Century Blackjack, 3 Card Poker, Pai Gow Poker, Ultimate Texas Hold'em, EZ Baccarat, Big O, and Omaha, as well as jackpots in poker, 3 card poker and other games. In addition to great casino action and promotions, the Debtor offers exceptional dining in its restaurant. Over its years in business, the Debtor has grown to become a significant community presence (including support of several local non-profits), a substantial taxpayer and major employer in Ventura County.

8.    The gaming industry is highly regulated, requiring the Debtor to maintain licenses and pay gaming taxes to continue its operations. The Debtors' casino is subject to extensive regulation under the laws, rules, and regulations of California. These laws, rules, and regulations generally concern the responsibility, financial stability, and character of the owners, managers, and persons with financial interests in the gaming operations. Violations of laws could result in disciplinary action and loss of the Debtors license to operate its gaming business.

9.    Besides laws, rules, and regulations relating to gaming, the Debtors' business is also subject to various federal, state, and local laws and regulations, including restrictions and

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

1    conditions concerning alcoholic beverages, smoking, environmental matters, employees, currency

2    transactions, taxation, zoning and building codes, construction, land use, and marketing and

3    advertising. Further, because the Debtor deals with significant amounts of cash in the ordinary

4    course of its operations, it is subject to various reporting and anti-money laundering regulations.

5        10.    The Debtor has been very profitable in the past. In 2018 and 2019 its gross

6    revenues exceeded $16,000,000.00. However, due to the COVID pandemic its 2020 gross

7    revenues were approximately $4,000,000.00. Thus, although the Debtor had been profitable in

8    2018 and 2019, and is very well regarded, a number of recent events have impacted its ability to

9    continue profitable operations. **First**, the Debtor entered into a lease on December 1, 2010 to

10   operate its business at 6580 Auto Center Drive, Ventura, CA 93003 (the **"Lease"**) with a

11   termination date of March 31, 2021. The Lease contained an option for an additional five (5) year

12   extension, which required that the extension be requested by no later than September 30, 2020. At

13   that time, the Debtor was concerned with a number of issues, including but not limited to state and

14   local restrictions of the premises including closure due to the COVID pandemic, the amount of

15   rent to be paid under the extension, and the uncertainty of when operations could continue in a

16   normal manner, and therefore proposed to the landlord a number of terms to modify the Lease that

17   the Debtor required the landlord agree to, in order for the Debtor to agree to the Lease extension

18   option. The landlord never agreed to the Debtors requested modifications to the Lease, and

19   therefore the Lease extension with the landlord did not occur and the Debtor has vacated the

20   premises, and the Debtor is presently looking for a new location to operate its business.

21       11.    **Second**, with the onset of the COVID pandemic and the uncertainty involved with

22   operating a business in these times, the Debtor has not been able to be open for normal business

23   operation during the COVID pandemic due to state and local restrictions. It is unclear when the

24   moratorium and restrictions will be lifted, and in what manner and how the Debtor will be able to

25   operate as guidelines and the virus itself change on an almost daily basis. Unfortunately, the lifting

26   of the restrictions has not occurred and it is not anticipated to happen in the near future in such a

27   way that the Debtor could operate. Therefore, the Debtor is presently waiting for its opportunity to

28

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

1  commence and open its business in such a manner that it can be both profitable and meet any

2  governmental restrictions.

3      12.    These issues coupled with the uncertainty in the present business environment has

4  created cash flow and business challenges that have resulted in giving the Debtor no alternative.

5  The Debtor was informed and believes that, without the commencement of this case, the Debtors

6  ability to operate was at risk. Subsequently, the Debtor commenced its Chapter 11 bankruptcy

7  case. The Debtors gambling services have historically performed exceptionally well, and it is

8  expected that in the future this will continue as long as the Debtor is able to formulate a reasonable

9  plan of reorganization to pay off its creditors.

10      13.    Prior to filing the bankruptcy case, the Debtor formulated a number of changes to

11  improve profitability which will be implemented during the bankruptcy case and subsequent to

12  confirmation of its plan of reorganization.  These changes include: (1) finding a new location to

13  operate its business that is conducive to the COVID environment; (2) reducing the number of

14  personnel to account for COVID issues; (3) implementing more aggressive advertising and a new

15  focused advertising program in the COVID environment once a new location is found; (4)

16  modifying its marketing plan; and (5) implementing strict policies on purchases and supplies. The

17

18  Debtor believes that these changes will allow the Debtor to propose a plan of reorganization

19  promptly, which will pay all of the estate's creditors.

20                          **PART II**

21                    **FIRST DAY MOTIONS**

22  A.    **EMERGENCY MOTION BY DEBTOR FOR ORDER (1) AUTHORIZING THE**

23       **DEBTOR TO CONTINUE ITS CASH MANAGEMENT SYSTEM, (2) MAINTAIN**

24       **ITS EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (3)**

25       **GRANTING RELATED RELIEF**

26       14.    The Debtor seeks entry of an Order:

27       •    authorizing, but not directing, the Debtor to (i) continue to operate its Cash

28

DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS

Management Systems, (ii) continue to use, with the same account numbers, all of the Bank Accounts (as defined herein) in its Cash Management System, (iii) open new debtor-in-possession accounts, if needed, and (iv) use its existing correspondence and business forms (including letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtor in possession; and

      •     authorizing and directing the Banks (as defined herein) to (i) continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor as debtor in possession and provide related treasury and cash management services, without interruption and in the ordinary course, (ii) receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, automated clearing house ("ACH") transfers, credit card payments, other electronic transfers, or other items presented, issued, or drawn on the Bank Accounts, and (iii) debit or charge back the Bank Accounts for all undisputed prepetition and postpetition Bank Fees (as defined herein), unreimbursed coin and currency orders provided by the Banks from their cash vaults, banking centers, or automated business centers.

15.    **The Bank Accounts will be reported on the Debtor's MOR so that the US Trustee and creditors can monitor the Bank Accounts activity and ensure that it is not used for an improper purpose.**

### 1. The Debtors' Cash Management System.

16.    The Debtor maintains and directs an integrated Cash Management System as part of the ordinary course of its business that allows it to efficiently collect, transfer, and disburse funds generated by its casino, gaming, and entertainment operations. The Cash Management System is vital to the Debtors' ability to conduct business at its card room operations. Indeed, the integrated Cash Management System helps control funds, serves as a repository for cash receipts, manages cash disbursements, manages automatic payments to various vendors, ensures cash availability for funds that are required to be maintained pursuant to gaming laws,

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

1    and reduces administrative expenses by facilitating the movement of funds among multiple

2    accounts by generally centralizing cash operations from a central location. **Further, the Debtors'**

3    **heavily regulated business relies on the existing Cash Management System to comply with**

4    **certain government regulations**. Moreover, the Cash Management System generally is similar to

5    those commonly employed by other businesses comparable to that of the Debtor.

6

7       17.    Further, the California Gambling Control Act, Regulations (Title 11, CCR,

8    Division 3) Section 2053, states the California requirements to maintain adequate amounts in

9    certain accounts as requested herein as follows:

10      § 2053. **Adequate Financing.**

11          (a) The Bureau may require a gambling establishment to present
12    satisfactory evidence that there is adequate financing available to protect the
      public's health, safety and welfare.
13          (b) A gambling establishment shall maintain a separate, specifically
      designated, insured account with a licensed financial institution in an amount not
14    less than the total value of the chips in use by the gambling establishment. The
      funds from that account may only be used to redeem the chips of that gambling
15    establishment. That account may not be used as collateral, or encumbered or
      hypothecated in any fashion. Alternatively, the Bureau may allow the gambling
16    establishment to provide some other form of security acceptable to the Bureau, in
      lieu of maintaining the required account.
17          (c) A gambling establishment shall maintain a separate, specifically
      designated, insured account with a licensed financial institution in an amount not
18    less than the total amount of the monies that patrons of that gambling establishment
      have on deposit with the gambling establishment. The funds from that account may
19    only be used to return to the patrons the balance of monies on deposit with the
      gambling establishment. That account may not be used as collateral, or encumbered
20    or hypothecated in any fashion. Alternatively, the Bureau may allow the gambling
      establishment to provide some other form of security acceptable to the Bureau, in
21    lieu of maintaining the required account.

22

23

24      18.    As described herein, given the economic and operational scale of the Debtors'

25    operations, any disruption to the Cash Management System would have an immediate adverse

26    effect on the Debtors' business and operations to the detriment of its bankruptcy estate and

27    stakeholders. Accordingly, to minimize the disruption caused by this chapter 11 case and to

28

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

maximize the value of the Debtors' estate, the Debtor requests authority to continue to utilize its existing Cash Management System during the pendency of this chapter 11 case, subject to the terms described herein.

**2.   Description of the Cash Management System.**

**(i)      The Bank Accounts**

19.      The Cash Management System consists of 8 active operating bank accounts (collectively, the "**Bank Accounts**") maintained by the Debtor at two U.S. banks (collectively, the "**Banks**"). The Cash Management System includes the following Banks and Bank Accounts:   (a) six (6) Bank Accounts at Comerica Bank  ("**Comerica**") which includes a Main Checking Account (XXX4102) with a balance of $2,282,552.33 on the Petition Date, Payroll Checking Account (XXX9503) with a balance of $0 on the Petition Date, Petty Cash Account (XXX6042) with a balance of $7,600.00 on the Petition Date, Players Bank Liability Account (XXX4102) with a balance of $81,944.93 on the Petition Date, Chip Liability Account (XXX4094) with a balance of $112,423.00 on the Petition Date and Jackpot Liability Account (XXX4110) with a balance of $1,225,117.22 on the Petition Date;  a n d  (b) two (2) Bank Accounts at Mechanics Bank ("**Mechanics**") which includes account Cash Checking Fund (XXX7651) with a balance of $1,056.00 on the Petition Date, and Extended Credit Fund (account XXX3451) with a balance of $2,112.04 on the Petition Date. As discussed below, all the Bank Accounts are maintained with Banks designated as authorized depositories by the Office of the United States Trustee for the Central District  of  California  (the  "**U.S. Trustee**"),  pursuant  to the  U.S.  Trustee's Operating Guidelines and Financial Reporting Requirements for Debtors-in-Possession and Trustees (the "**U.S. Trustee Guidelines**"). A schedule of the Bank Accounts is attached  as Exhibit "A" to the Motion, and is incorporated herein by reference.

20.      Generally, the Bank Accounts are organized as follows:

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

**"Main Checking Account"** includes: Bank Accounts established to, among other things: (a) receive credit card payments, wire transfers, checks, and cash funds, (b) pool tips for the benefit of employees, (c) comply with state-specific obligations required by regulatory requirements to maintain licenses, (d) hold funds related to wagers, purses, and related activities, and (e) disburse funds as necessary to pay ordinary business expenses and transfer funds to the Bank Accounts as necessary.

**"Payroll Account"** include: funds are transferred to pay payroll as payroll becomes due, and otherwise the account maintains a minimal balance.

**"Players Bank Liability Account, Chip Liability Account and Jackpot Liability Account"** includes: Funds maintained to comply with the Debtors' heavily regulated business with certain government regulations and maintenance of liability for these type of matters (similar to trust fund accounts). Further, the California Gambling Control Act, Regulations (Title 11, CCR, Division 3) Section 2053, states the California requirements to maintain adequate amounts in certain accounts as those herein. These accounts are required to be maintained by the State of California, in a separate, specifically designated, insured account with a licensed financial institution in an amount not less than the total value of the chips in use by the gambling establishment. The funds from that account may only be used to redeem the chips of that gambling establishment. That account may not be used as collateral, or encumbered or hypothecated in any fashion. Further, the State of California requires a separate, specifically designated, insured account with a licensed financial institution in an amount not less than the total amount of the monies that patrons of that gambling establishment have on deposit with the gambling establishment. The funds from that account may only be used to return to the patrons the balance of monies on deposit with the gambling establishment. That account may not be used as collateral, or encumbered or hypothecated in any fashion. Thus, these accounts are similar to trust accounts

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

and must be maintained as is with the appropriate balances. The Debtor requests that it be authorized, but not required to maintain these Bank Accounts in a status quo manner until operating restrictions are lifted by governmental authorities, the Debtor is open for business, and thus no distributions from these bank Accounts will be made until that time.

### 3. The Cash Management System's Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.

21.    As noted above, all of the Bank Accounts are maintained with Banks designated as authorized depositories by the U.S. Trustee. The U.S. Trustee has designated the following Banks that hold Bank Accounts as authorized depositories: Comerica and Mechanics.

22.    In addition, the Debtors' cash is kept in the Bank Accounts and is not invested in any money market or other types of short-term securities. The Debtor therefore does not believe that any of the Bank Accounts are "investment accounts" as contemplated by section 345(b) of the Bankruptcy Code.

### 4. Banking Transactions, Bank Fees, and Related Expenses.

23.    The Debtor conducts transactions by debit, wire, credit card, ACH payments, and other similar methods, as well as by check. Moreover, a certain percentage of the Debtors' vendors are on automatic payment, and customer receipts are received through wire transfer, credit card payments, and ACH payments. Thus, the Debtors' ability to conduct transactions by debit, wire, ACH payment, or other similar methods is of vital importance to their ability to manage its businesses; if the Debtor were unable to perform such transactions, it may be unable to perform under certain contracts, its business operations may be unnecessarily disrupted, its bankruptcy estate may incur additional costs, and stakeholder value may be needlessly destroyed. Yet the U.S. Trustee Guidelines require chapter 11 debtors to annotate all receipts and to make all disbursements of estate funds by check annotated with the reason for the disbursement.

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

24.    It is therefore important that the Banks continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor, as debtor in possession, without interruption and in the ordinary course of business. In this regard, the Banks should be authorized and directed to receive, process, honor, and pay any and all checks, ACH transfers, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

25.    In addition, in the ordinary course of business, the Banks charge, and the Debtor pays, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "**Bank Fees**"). The Debtor estimates that a de minimum amount of accrued but unpaid Bank Fees exists as of the Petition Date (collectively, the "**Prepetition Bank Fees**"). The Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtors' banking transactions.

26.    Accordingly, to maintain the integrity of the Cash Management System, it is important that the Banks are able to (a) continue to charge the Debtor the Bank Fees and (b) charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the Petition Date in the ordinary course of business and consistent with prior practice. In addition, it is important that the Debtor is authorized to honor and pay any and all other Prepetition Bank Fees required by the Cash Management System in the ordinary course of business.

27.    As part of the Cash Management System, the Debtor utilizes numerous preprinted business forms in the ordinary course of its business. The Debtor also maintains books and records to document, among other things, its profits and expenses. Rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines, the Debtor is seeking authority to continue using all currently existing

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

1  correspondence and business forms (including letterhead, purchase orders, invoices, and

2  preprinted checks) as such forms were in existence immediately before the Petition Date, without

3  reference to the Debtors' status as debtor in possession. This will minimize expenses to the

4  Debtors' estate and avoid confusion on the part of employees, customers, vendors, and suppliers

5  during the pendency of this chapter 11 case. **The Bank Accounts will be reported on the**

6  **Debtor's MOR so that the US Trustee and creditors can monitor the Bank Accounts activity**

7  **and ensure that it is not used for an improper purpose.**

8  **B.    EMERGENCY MOTION BY DEBTOR FOR ORDER (1) AUTHORIZING THE**

9  **DEBTOR TO MAINTAIN AND ADMINISTER THEIR EXISTING CUSTOMER**

10  **PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS**

11  **RELATED THERETO, AND (2) GRANTING RELATED RELIEF**

12  28.    The Debtor traditionally has maintained various customer-related programs in the

13  ordinary course of business designed to enrich their customers' loyalty and goodwill and sustain

14  the Debtors' positive reputation in the marketplace. **In addition, due to gaming rules and**

15  **restrictions the Debtor is obligated to maintain these programs to continue to be in**

16  **compliance with governmental regulations.** Among others, these programs include: (a) Chip

17  Liability Programs (b) Safekeeping, Players Bank; (c) Customer Deposits; (d) Outstanding

18  Gaming Currency; and (e) Jackpot Liability Account (the **"Customer Programs"**). **The Chip**

19  **Liability, Players Bank and Jackpot Liability accounts are designed to fulfill the Adequate**

20  **Financing mandate of California gambling regulations.**

21  29.    The importance of maintaining the Customer Programs and honoring related

22  prepetition obligations cannot be understated. The Debtor operates in highly competitive market

23  where the quality of customer experience is a defining factor in differentiating the Debtor from its

24  competitors. The Debtor relies heavily on the Customer Programs to ensure a customer experience

25  that surpasses expectations and to insure compliance with California gambling regulations. The

26

27

28

DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS

1  goal is to drive repeat business, attract new customers, and ultimately (as a result) increase

2  revenue and earnings.

3      30.    Further, the California Gambling Control Act, Regulations (Title 11, CCR,

4  Division 3) Section 2053, states the California requirements to maintain adequate amounts in

5  certain accounts as requested herein as follows:

6

7      § 2053. **Adequate Financing**.

8          (a) The Bureau may require a gambling establishment to present
satisfactory evidence that there is adequate financing available to protect the
9      public's health, safety and welfare.
          (b) A gambling establishment shall maintain a separate, specifically
10     designated, insured account with a licensed financial institution in an amount not
less than the total value of the chips in use by the gambling establishment. The
11     funds from that account may only be used to redeem the chips of that gambling
establishment. That account may not be used as collateral, or encumbered or
12     hypothecated in any fashion. Alternatively, the Bureau may allow the gambling
establishment to provide some other form of security acceptable to the Bureau, in
13     lieu of maintaining the required account.
          (c) A gambling establishment shall maintain a separate, specifically
14     designated, insured account with a licensed financial institution in an amount not
less than the total amount of the monies that patrons of that gambling establishment
15     have on deposit with the gambling establishment. The funds from that account may
only be used to return to the patrons the balance of monies on deposit with the
16     gambling establishment. That account may not be used as collateral, or encumbered
or hypothecated in any fashion. Alternatively, the Bureau may allow the gambling
17     establishment to provide some other form of security acceptable to the Bureau, in
lieu of maintaining the required account.
18

19

20     31.    If the Debtor fails to maintain and honor the Customer Programs, it will put at risk

21  its most valuable intangible assets— its gaming license, customer loyalty and goodwill. The

22  resulting loss would not only jeopardize the Debtors' bottom line, it would threaten its ability to

23  successfully reorganize. Moreover, failure to honor certain of the Customer Programs would

24  trigger violations under California state gaming and other laws and regulations. As such, the

25  continuation of the Customer Programs in the ordinary course (including the ability to pay related

26

27

28

DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS

prepetition obligations) is necessary to the fair and responsible administration of this chapter 11 case and essential to maximize the value of the Debtors' estates

i.    **Chip Liability Program**

32.    In the ordinary course of business, the Debtor covers all "outstanding chips"- chips that have been purchased and put into play but have not been redeemed. As is customary in the casino business, the Debtor routinely issues gaming chips to  customers  for  use  at  gaming tables. Customers possess the chips while on the Debtors' property, and some customers, whether advertently or inadvertently, retain the chips after they leave the property.  The Debtor generally accounts monthly for the amount of outstanding chips, as  of  the  Petition  Date, customers  are  in  possession  of  approximately $112,423.00 in outstanding chips. The casino is required to have funds to cover the amount of outstanding chips. If all players and employees who have chips in their possession wished to redeem them, the Chip Liability bank account ensures sufficient backup for this redemption. Chip Liability is a natural function of the business.

33.    Further, the California Gambling Control Act, Regulations (Title 11, CCR, Division 3) Section 2053, states the California requirements to maintain adequate amounts in certain accounts as those herein. These accounts are required to be maintained by the State of California, in a separate, specifically designated, insured account with a licensed financial institution in an amount not less than the total value of the chips in use by the gambling establishment. The funds from that account may only be used to redeem the chips of that gambling establishment. That account may not be used as collateral, or encumbered or hypothecated in any fashion. The Debtor requests that it be authorized but not required to maintain the Clip Liability account in a status quo manner until operating restrictions are lifted by governmental authorities, the Debtor is open for business, and thus no distributions from the account will be made until that time.

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

ii.    **Players Bank Program**

34.    The Debtors Players Bank Program allows a customer the option of keeping funds on reserve with the casino. A player may win a large amount, cash out some portion of their winnings and deposit the balance in their Players Bank account. The next time they come in, they can withdraw funds to play from this account. In the ordinary course of their businesses, the Debtors hold certain customer winnings until the customer claims those winnings. For example, when a customer lacks proper identification, any winnings of that customer are held by the Debtor until the customer is able to produce proper identification to claim the winnings. Additionally, the Debtor holds funds in where a customer does not wish to immediately claim its winnings. Depending on the circumstances and applicable legal requirements, such funds are subsequently remitted to either the customer or the applicable state upon demand. As of the Petition Date, the Debtors Player Bank Account has approximately $81,944.93 being maintained in the Debtors bank account designated for this purpose. The state requires the Debtor to maintain a segregated bank account (Players Bank liability account) with funds to cover all current Players Bank balances. Player's Banks are a customer convenience and benefit the business by providing easy access to gambling funds.

35.    Further, the California Gambling Control Act, Regulations (Title 11, CCR, Division 3) Section 2053, states the California requirements to maintain adequate amounts in certain accounts as those herein. The State of California requires a separate, specifically designated, insured account with a licensed financial institution in an amount not less than the total amount of the monies that patrons of that gambling establishment have on deposit with the gambling establishment. The funds from that account may only be used to return to the patrons the balance of monies on deposit with the gambling establishment. That account may not be used as collateral, or encumbered or hypothecated in any fashion. The Debtor requests that it be authorized

DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS

but not required to maintain the Players Bank Liability account in a status quo manner until

operating restrictions are lifted by governmental authorities, the Debtor is open for business, and

thus no distributions from the account will be made until that time.

### iii.    Jackpot Liability Program

36.    In the ordinary course of business, the Debtor holds funds which have been

collected from various progressive or fixed player-funded jackpot promotions. In these

promotions, a set amount is collected by the dealer from participating players each hand. The

amount collected is accounted for separately and held in the "**Jackpot**" account, and used to pay

out jackpots as they are won. As this is the players' money, not the casinos, the state requires it to

be maintained separately from operations accounts. Jackpots are promotions meant to attract and

retain customers.

37.    Further, the California Gambling Control Act, Regulations (Title 11, CCR,

Division 3) Section 2053, states the California requirements to maintain adequate amounts in

certain accounts as those herein. The State of California requires a separate, specifically

designated, insured account with a licensed financial institution in an amount not less than the

total amount of the monies that patrons of that gambling establishment have on deposit with the

gambling establishment. The funds from that account may only be used to return to the patrons the

balance of monies on deposit with the gambling establishment. That account may not be used as

collateral, or encumbered or hypothecated in any fashion. As of the Petition Date, the Debtors

Jackpot Bank Account has approximately $1,225,117.22 being maintained in the Debtors bank

account designated for this purpose. The Debtor requests that it be authorized but not required to

maintain the Jackpot Liability account in a status quo manner until operating restrictions are lifted

by governmental authorities, the Debtor is open for business, and thus no distributions from the

account will be made until that time.

### C.    EMERGENCY MOTION BY DEBTOR FOR ORDER (1) AUTHORIZING THE

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

**DEBTOR TO CONTINUE ITS PREPETITION INSURANCE COVERAGE, (2) SATISFY PAYMENT OF PREPETITION OBLIGATIONS RELATED TO THAT INSURANCE COVERAGE IN THE ORDINARY COURSE OF BUSINESS, AND (3) RENEW, SUPPLEMENT, OR ENTER INTO NEW INSURANCE COVERAGE IN THE ORDINARY COURSE OF BUSINESS, AND (4) GRANTING RELATED RELIEF**

38.      In the ordinary course of their business, the Debtor maintains multiple insurance policies providing coverage for, among other things, automobile liability, crime liability, employment-practice liability, general liability, property liability, earthquake, Kidnap & Ransom, Cybersecurity, Crime, directors and officers liability, and workers' compensation liability[1] (collectively, the "**Policies**"). The Policies providing coverage for the Debtor are current, however, in an abundance of caution, the Debtor files this Motion. A schedule of the current Policies is attached to the Motion as Exhibit "A", and incorporated herein by reference.[2]

**1.    General Liability and Excess Insurance.**

39.      In the ordinary course of business, the Debtor maintains general-liability insurance that covers against, among other things, personal injury, bodily injury, automobile liability, innkeeper's and garage keeper's liability, and umbrella excess liability (the "**General Liability Policies**"). The Debtor obtains the current General Liability Policies as set forth in Exhibit "A". Generally, the costs associated with the General Liability Policies are allocated either in accordance with market practice by relying on calculations of the relative exposure or on a fixed, per-claim basis that assesses a predetermined amount for each applicable insurance claim,

---

[1] The descriptions of the Policies set forth in this Motion constitute a summary only. The actual terms of the Policies and related agreements will govern in the event of any inconsistency with the descriptions in this Motion

[2] In addition to the Policies listed in Exhibit "A", the Debtor maintains numerous insurance policies with respect to, among other things, employee health and dental benefits.

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

depending on the nature of the coverage. Payments on the General Liability Policies are current, and expires on May 30, 2021.

### 2. Workers' Compensation Insurance.

40.    In the ordinary course of business, the Debtor maintains workers' compensation insurance policies for the benefit of the employees of the Debtor (the "**Workers' Compensation Policies**"). Payments on the Workers' Compensation Policies may be due, and expires on April 1, 2022

### 3. Directors and Officers Insurance.

41.    In the ordinary course of business, the Debtor maintains insurance coverage for the directors and officers of the Debtor that covers, among other things, defense costs, damages, settlements, and pre- and post-judgment interest arising from claims alleging an insured is liable for a breach of duty, neglect, error, misstatement, misleading statement, omission, securities-regulation violation, or any other act causing damage to the Debtor or its shareholders (the "**D&O Policies**"). The Debtor obtains the current D&O Policies from several different Insurance Carriers.   Payments on the D&O Policies are current, and expires on March 22, 2022.

### 4. Other Insurance.

42.    In addition to the Policies discussed above, the Debtor maintains the following categories of insurance policies that cover the Debtor: (a) media and cyber risk coverage, protecting against, among other things, database breaches and unauthorized access; coverage against crimes such as theft and wire fraud; (c) crime coverage; (d) automobile coverage; (e) earthquake coverage; and (f) Kidnap & Ransom. The Debtor obtains these miscellaneous policies from various carriers. The costs associated with these Policies are allocated in accordance with market practice by calculating the relative exposure. The Debtors additional Policies renew throughout the year.

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

**D.    EMERGENCY MOTION BY DEBTOR FOR ORDER (1) AUTHORIZING THE DEBTOR TO PAY CERTAIN PREPETITION AND POSTPETITION TAXES AND FEES, AND (2) GRANTING RELATED RELIEF**

43.    In the ordinary course of business, the Debtor: (a) collects and incurs taxes in both California and the United States, including Sales and Use Taxes, Franchise Taxes, Income Taxes, Real and Personal Property Taxes, Gaming Taxes and Fees, and other taxes (as each is defined herein, and, collectively, the "**Taxes**"); (b) incur fees, assessments, and other similar charges necessary to operate their business, including fees related to Business Licenses and Permits, and Other Fees (as each is defined herein, and, collectively, the "**Fees**"); and (c) remit such Taxes and Fees to various taxing, licensing, regulatory, and other authorities (collectively,the "**Authorities**").  The Debtor pays or remits, as applicable, Taxes and Fees daily, weekly, monthly, quarterly, semi-annually, or annually to the respective Authorities, as required by applicable laws and regulations. Any failure by the Debtor to pay the Taxes and Fees could have a material adverse impact on their ability to operate and maintenance of its gaming licenses.

**1.  Sales and Use Taxes.**

44.    The Debtor incurs and collects from customers various state, local, sales taxes (the "**Sales Taxes**"), including food and beverage, entertainment, and luxury taxes, in connection with the sale of various products and services to their customers. Sales Taxes are charged at the point of purchase for certain goods and services and set by the applicable taxing authority as a percentage of the total purchase price.   Generally, the Debtor collects and remits Sales Taxes to Authorities on a monthly or quarterly basis following their collection.

45.    The Debtor is responsible for remitting use taxes (the "**Use Taxes**," and together with the Sales Taxes, the "**Sales and Use Taxes**") on account of the purchase of tangible personal property and certain goods and services from vendors who are not always located in the state to which the property is to be delivered.  Use Taxes typically arise if a supplier does not have

19

business operations in the state in which it is supplying goods and does not charge state taxes. In such instances, applicable law generally requires the Debtor to self-assess the amount of Use Taxes and, accordingly, pay Use Taxes to the applicable Authorities. Generally, the Debtor collects and remits Use Taxes to Authorities on a monthly, quarterly, or annual basis following their collection.

46.    From time to time, the Debtor also receives certain tax credits from Authorities for overpayments or refunds of Sales and Use Taxes. The tax credits may arise, for instance, if the amount of the Debtors' prepayment of Sales and Use Taxes exceeds the actual amount of Sales and Use Taxes owed that month.  The Debtor uses these tax credits in the ordinary course of business to offset against future Sales and Use Taxes. By this Motion, the Debtor seeks authority to continue using such tax credits from time to time in the ordinary course of business.

From time to time, the Debtor may prepay an estimated amount of the Sales and Use Taxes it owes to applicable Authorities on a monthly basis. To the extent that the Debtors' actual tax liability exceeds the estimated prepayment, the Debtor owes monthly true-ups to the applicable Authorities.

47.    The Debtor believes it is current with respect to its payment of Sales and Use Taxes and that no Sales and Use Taxes will come due within the first 21 days of this chapter 11 case. However, out of an abundance of caution, the Debtor seeks authority to pay any outstanding Sales and Use Taxes due as of the Petition Date, and continue to pay Sales and Use Taxes on a postpetition basis in the ordinary course of business.

**2.   Franchise and Income Taxes.**

48.    The Debtor pays certain franchise taxes (the "**Franchise Taxes**") to Authorities as a condition to operate its businesses.  Franchise Taxes may be based on net operating income, a

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

flat fee, or the amount or value of capital used in the business. The Debtor pays Franchise Taxes on a bi-weekly, quarterly, or annual basis.

49.     The Debtor estimates that as of the Petition Date, Franchise Taxes will have accrued that remain unpaid, but none will become due and owing during the first 21 days of this chapter 11 case.

50.     Additionally, the Debtor pays income or corporate taxes (the "**Income Taxes**") on net income (<u>i.e.</u>, the difference between gross receipts, expenses, and additional write-offs). The Debtor is required to pay, when due, Income Taxes on a monthly or quarterly basis. For 2020, the Debtor did not pay any Income Taxes due to projected net operating losses. As of the Petition Date, the Debtor does not owe any Income Taxes and no Income Taxes will come due within the first 21 days of this chapter 11 case. However, out of an abundance of caution, the Debtor seeks authority to pay any outstanding Income Taxes due as of the Petition Date, and continue to pay Sales and Use Taxes on a postpetition basis in the ordinary course of business.

**3.  <u>Real and Personal Property Taxes.</u>**

51.     State and local laws in which the Debtor operates generally grant Authorities the power to levy property taxes against the Debtors' personal and real property (the "**Real and Personal Property Taxes**"). To avoid the imposition of statutory liens on its property, the Debtor typically pays the Real and Personal Property Taxes in the ordinary course of business on a quarterly, semi-annual, or annual basis, as applicable, which typically is calculated in arrears.

52.     From time to time, the Debtor also receive certain tax credits for overpayments or refunds of Real and Personal Property Taxes. These credits may arise, for instance, if the amount of the Debtors' prepayment of Real and Personal Property Taxes exceeds the actual amount of taxes owed. The Debtor uses these credits in the ordinary course of business to offset against future Real and Personal Property Taxes.

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

53.     The Debtor estimates that as of the Petition Date, Real and Personal Property Taxes will have accrued and remain unpaid, of which some may become due and owing within the first 21 days of this chapter 11 case.

**4.   Gaming Taxes and Fees.**

54.     In the ordinary course of business, the Debtor is required to pay certain gaming-related taxes and fees (the "**Gaming Taxes and Fees**") to various Authorities. These Gaming Taxes and Fees are payable daily, weekly, quarterly, or annually, as applicable, and the amounts are based upon a number of criteria, including (a) flat fees, (b) a percentage of gross revenues received, (c) the number of gaming devices operated during the applicable period, and (d) the need for withholding from patron winnings.

The Gaming Taxes and Fees include:

**Gaming Revenue Taxes**. In addition to Income Taxes, some state and local Authorities impose flat and/or graduated taxes on gaming receipts, which are remitted to Authorities on a daily, weekly,monthly, quarterly, or annual basis, as required by applicable law and regulations.

**Tax Withholdings from Patron Winnings**. Certain Authorities, including the Internal Revenue Service, require the Debtor to  withhold certain amounts from patron winnings in the ordinary course of business. Such withholdings are typically remitted to Authorities on a bi-weekly basis.

**Regulatory Fees**. Certain local, state, and federal Authorities impose various fees for necessary regulatory licenses, including casino and gaming licenses. The Debtor also pays regulatory fees to certain Authorities to cover costs for complying with state and local gaming laws and obtaining gaming licenses for employees. Such fees are typically remitted to Authorities on a weekly, monthly, quarterly, or annual basis.

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

**Additional Miscellaneous Gaming Taxes and Fees**. Several Authorities impose miscellaneous Gaming Taxes and Fees on the Debtors' operations including, without limitation, admission taxes and fees, federal excise taxes on wagering, a n d law enforcement fees.

The Debtor estimates that, as of the Petition Date, Gaming Taxes and Fees will have accrued and remain unpaid, of which some will become due and owing within the first 21 days of this chapter 11 case.

**5.  Business Licenses, Permits, and Other Fees.**

55.    The Debtors must obtain various non-gaming related business licenses  and permits (the "**Business License and Permits**") and pay corresponding fees (the "**Other Fees**") to operate their business. State and local laws require the Debtor to pay Other Fees for a  wide-range of Business Licenses and Permits (e.g., operating, mercantile, health, restaurant, telecommunications, vehicle, and liquor–from a number of local, state, and federal regulatory agencies).   Further, certain state Authorities require that the Debtor pay annual reporting fees to remain in good standing and conduct business within the state. The method for calculating amounts due for the Business Licenses and Permits and the deadlines for paying such amounts varies. Generally, the Debtor collects and remits the Other Fees due on a weekly, bi-weekly, monthly, quarterly, annual, or semi-annual basis, depending on the jurisdiction.

56.    The Debtor estimates that as of the Petition Date, Other Fees  for Business License and Permits will have accrued and remain unpaid, of which some may become due and owing during the first 21 days of this chapter 11 case.

**E.    EMERGENCY FIRST DAY MOTION TO REJECT REAL PROPERTY EXECUTORY CONTRACTS UNDER 11 U.S.C. § 365**

57.    The Debtor, the debtor and debtor in possession herein moves the Court for an order allowing the rejection of its executory contracts on the following real property (1) lease, and

1  any amendments including the first amendment to lease ("**Auto Center Lease**") with Hofer

2  Vineyards, LLC ("**Hofer Vineyards**") for the premises located at 6580 Auto Center Drive,

3  Ventura, California 93003 (the "**Auto Center Premises**" or "**Auto Center Property**") and (2) the

4  parking area license ("**License**") with Hofer Properties, LLC ("**Hofer Properties**") for a lot

5  adjacent to the Auto Center Premises (APN 138-0-230-730) which is referred to herein as the

6  "**Hofer Properties Lot**". Hofer Properties and Hofer Vineyards at the time of the License were in

7  the process of applying for a lot line adjustment (the "**LLA**") which would incorporate a portion

8  of the Hofer Properties Lot into the lot on which the Auto Center Premises is located. The area

9  that is the subject of the LLA is referred to herein as the "**LLA Area**".[3] Hofer Vineyards and

10  Hofer Properties will be referred to herein as the "**Landlord**". The Auto Center Premises, Auto

11  Center Property and Hofer Properties Lot are referred to herein as the "**Premises**" or "**Property**".

12  The Auto Center Lease and License are referred to herein as the "**Leases**". The Debtor requests

13  that the Leases be rejected as of the date of the filing of the bankruptcy case or April 7, 2021. A

14  copy of the Auto Center Lease and its First Amendment, is attached to the Motion and

15  incorporated herein by this reference as Exhibit "A". A copy of the License is attached to the

16  Motion and incorporated herein by this reference as Exhibit "B".

17        58.    The Premises no longer have any benefit to the estate. **This Motion is filed in an**

18  **abundance of caution as the Debtor believes the Leases were terminated pre-petition by the**

19  **terms of the Leases in which the Leases terminated on March 31, 2021**. The Debtor has

20  vacated the Premises per the expiration of the Leases on March 31, 2021. The Debtor entered into

21  the Auto Center Lease on December 1, 2010 to operate its business with a termination date of

22  March 31, 2021. The Auto Center Lease contained an option for an additional five (5) year

23  extension, which required that the extension be requested by no later than September 30, 2020. At

24

25      [3] If the LLA is approved, Hofer Vineyards and the Debtor contemplated to incorporate the LLA Area into the
Auto Center Premises to allow for expansion of the existing parking on the Auto Center Premises. Concurrent with the
execution of the License, Hofer Vineyards and the Debtor entered into the First Amendment to Lease (the "**First**

26  **Amendment**") which provides for incorporation of the LLA Area into the Auto Center Premises if and when the LLA
is recorded with the Ventura County Recorder. It is not clear if the License terminated automatically by virtue of the

27  recording with the Ventura County Recorder of all documents and instruments required to complete the LLA.

28

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

1    that time, the Debtor was concerned with a number of issues, including but not limited to state and

2    local restrictions of the premises including closure due to the COVID pandemic, the amount of

3    rent to be paid under the extension, and the uncertainty of when operations could continue in a

4    normal manner, and therefore proposed to the Landlord a number of terms to modify the Auto

5    Center Lease that the Debtor required the Landlord agree to, in order for the Debtor to agree to the

6    Auto Center Lease extension option. The Landlord never agreed to the Debtors requested

7    modifications to the Auto Center Lease, and therefore the Auto Center Lease extension with the

8    Landlord did not occur and the Debtor has vacated the Premises. This location is not the location

9    of the Debtor's business present activities, and due to the filing of the bankruptcy case, the Debtor

10    has determined that this location cannot be used in the foreseeable future.  Since the Debtor filed

11    bankruptcy and now possess all the rights, obligations, and duties established by the Bankruptcy

12    Code as a debtor-in-possession, the Premises serve no purpose for the bankruptcy estate.

13    Therefore, the Debtor's immediate rejection of the Premises will result in a significant reduction of

14    potential administrative liability for the estate.

15        59.    The negative economic impact of the COVID-19 health crisis has created a

16    downturn driven by external, and uncontrollable influences. It appears that this uncontrollable

17    nature of this pandemic justifies suspension of contractual duties and/or entitles a party to

18    terminate its lease. Many legal arguments can support this position, including **force majeure**,

19    **impossibility**, **casualty**, **eminent domain** and **frustration of purpose**.

20

21        60.    This Motion is filed in an abundance of caution as the Debtor believes the Leases

22    were terminated pre-petition by the terms of the Leases in which the Leases terminated on March

23    31, 2021. Accordingly, the Debtor has determined to reject the Leases.  The Premises provides no

24    benefit to the estate because the Debtor cannot use the Premises to conduct its business activities.

25    Therefore, the Debtor's immediate rejection of the Leases will result in a significant reduction of

26    potential administrative liability for the estate.

27

28

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

1

2    I declare under penalty of perjury that the foregoing is true and correct.

3    Executed this 7th day of April, at Ventura, California.

4

5                                                    _____
                                                     Patrick Berry
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**

| In re: PLAYER'S POKER CLUB, INC., INC.<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 9:21-bk-10357-MB |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 11835 W. Olympic Blvd., Suite 695E, Los Angeles, California 90064

A true and correct copy of the foregoing document described as
**DECLARATION OF PATRICK BERRY IN SUPPORT OF FIRST DAY EMERGENCY MOTIONS**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 7, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):**
On **April 7, 2021,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 7, 2021 | Christa Anchrum | /s/Christa Anchrum |
|---|---|---|
| Date | Type Name | Signature |

| In re: PLAYER'S POKER CLUB, INC., INC.. | | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER:  9:21-bk-10357-MB |

**ADDITIONAL SERVICE INFORMATION (if needed):**

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

> Michael S Kogan on behalf of Debtor
> mkogan@koganlawfirm.com

> United States Trustee (ND)
> ustpregion16.nd.ecf@usdoj.gov

> Brian D Fittipaldi on behalf of U.S. Trustee United States Trustee (ND)
> brian.fittipaldi@usdoj.gov

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL - VIA U.S. MAIL**

> Hon. Martin Barash
> U.S. Bankruptcy Court
> 21041 Burbank Blvd.. #342
> Woodland Hills, CA 91367

> **Unsecured Creditors – Top 20**

> U.S. Small Business  Administration
> Attn: So Cal Legal Unit
> 330 North Brand Blvd., Suite 1200
> Glendale, CA 91203-2304

> Anderson Refrigeration Inc.
> 567 W. Channel Island Blvd., #227
> Port Hueneme, CA  93041

> Cobalt Security Services, Inc.
> 3075 E. Thousand Oaks Blvd., Suite #23
> Westlake Village, CA  91362

Deodate Corporation
898 N. Fair Oaks Ave., Suite F
Pasadena, CA  91103


SG Gaming Inc.
Lockbox #74335
Los Angeles, CA  90074-9335


Target Solutions Learning LLC
P.O. Box 122071, Dept 2071
Dallas, TX  75312-2271


Hofer Vineyards, LLC
6800 Auto Center Drive
Ventura, CA  93003


Hofer Vineyards, LLC
11248 S. Turner Avenue
Ontario, CA  91761-7600


Comerica
611 Anton Blvd., Suite 100
Costa Mesa, CA  92626-4558


Kallman + Logan & Company, LLP
125 S. Barrington Place
Los Angeles, CA  90049


Hayley S. Grunvald
Sheppard Mullin
12275 El Camino Real Suite 200
San Diego, CA  92130-4092


Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA  90071


Rubin Brown
5851 W. Charleston Blvd.
Las Vegas, NV 89146


Falk & Sharp
301 No. Lake Ave., Ste 1100

Pasadena, CA 91101

Fisher Phillips
1075 Peachtree St, NE, Ste 3500
Atlanta, GA 30309