# FOR PUBLICATION

**FILED & ENTERED**

**FEB 04 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY rust        DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

In re:

PLAYER'S POKER CLUB, INC.,

Debtor.

Case No.:   9:21-bk-10357-MB

Chapter 11

**MEMORANDUM OF DECISION**

# I.

## INTRODUCTION

Player's Poker Club, Inc. dba Players Casino (the "Debtor"), debtor and debtor in possession, filed a motion ("Motion") for approval of its rejection, under Bankruptcy Code section 365(a), of a nonresidential real property lease and parking area license under which Hofer Properties, LLC ("Hofer" and the "Hofer Lease and License") is the lessor and licensor.[1]  The Debtor requests approval of the rejection as of the petition date, or, alternatively, the day after the petition date, which is when the Debtor filed the Motion.  In other words, the Debtor requests an order with retroactive effect, i.e., on a date *prior* to when the Motion is granted and an order is entered by the court.

Hofer objects to the Motion, arguing that rejection of the lease and license lacks a reasonable business justification.  Hofer also argues that the Debtor improperly filed this case in bad faith, for the sole purpose of rejecting the Hofer Lease and License.

The court held a hearing and approved the Motion in open court.  The court files this Memorandum of Decision to further explain its conclusions: (i) the Debtor's decision to reject the Hofer Lease and License under Bankruptcy Code section 365(a) constitutes an appropriate exercise of business judgment, which the court will not disturb; (ii) the court has the authority to grant retroactive approval of such a rejection, notwithstanding the Supreme Court's decision in *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696 (2020) (per curiam); and (iii) cause exists to enter a *nunc pro tunc* order approving the Debtor's rejection of the Hofer Lease and License, retroactive to the date on which the Motion was filed and served.

# II.

## BACKGROUND

The Debtor is a gaming business.  Prior to its closure due to COVID-19 health restrictions imposed by state and local health officials, the Debtor operated the "Players Casino," a nearly 80-year-old card club in Ventura, California, featuring No Limit Hold'em, 21st Century Blackjack, 3

---

[1]  The "Bankruptcy Code" refers to 11 U.S.C. § 101 et seq.

1  Card Poker, Pai Gow Poker, Ultimate Texas Hold'em, EZ Baccarat, Big O, Omaha, and other card

2  games.

3        The COVID-19 pandemic and related restrictions on its operations severely impacted the

4  Debtor's revenues.  In 2018 and 2019, the Debtor's gross revenues exceeded $16 million each year.

5  In 2020, however, its revenues plummeted to $4 million.  Considering the operational restrictions

6  placed on the Debtor by state and local health authorities, the resulting financial distress, and

7  uncertainty regarding the duration of those operational restrictions, the Debtor elected to seek relief

8  under chapter 11 of the Bankruptcy Code.  The Debtor filed its voluntary petition on April 6, 2021.

9        One day later, the Debtor filed the Motion, seeking approval of the Debtor's decision to

10  reject the Hofer Lease and License.  The lease pertains to the premises at 6580 Auto Center Drive,

11  Ventura, CA 93003, where the Debtor had been operating the Players Casino until its operations

12  were interrupted by the pandemic.  The license pertains to an adjacent parking lot.  The Players

13  Casino closed at the outset of the COVID-19 pandemic in early 2020, in accordance with state and

14  local health directives.  The casino briefly reopened and operated pursuant to various restrictions,

15  but it was required by health authorities to close again in late 2020.  The casino did not re-open,

16  and the Debtor elected to vacate the premises on March 31, 2021.

17        The lease was entered into as of December 1, 2010.  The lease specifies a lease term ending

18  on March 31, 2021.  The lease also contains an option for an additional five-year extension, if

19  requested by no later than September 30, 2020.  The parties disagree on whether a lease extension

20  was ever effectuated.  Hofer contends that the Debtor—then contemplating the possibility of future

21  operations at the location—timely provided notice of a request for the extension.  Hofer further

22  contends that the Debtor then failed to cooperate with the process under which the property would

23  be appraised and a new lease rate established.  Hofer argues that the lease term was extended

24  notwithstanding the Debtor's conduct.  In contrast, the Debtor contends that no extension became

25  effective and that the lease terminated according to its terms on March 31, 2021. [2]

26

27  ─────────────────────

[2]  The license appears to have been entered three years after the Hofer Lease, on December 19,
28  2013, and does not specify a termination date.

Not surprisingly, the Debtor describes its motivation for rejecting the Hofer Lease and License as an "abundance of caution."  The Debtor does not believe there was any lease or license in existence after March 31, 2021.  But, to the extent the Hofer Lease and License did not terminate on that date, the Debtor seeks to reject them under Bankruptcy Code section 365(a), relegate any resulting damages claim to a prepetition claim under Bankruptcy Code section 365(g), and limit the amount of that damages claim under Bankruptcy Code section 502(b)(6). [3]

Although Hofer disagrees that the lease terminated on March 31, 2021, Hofer does not dispute that on that date, the Debtor vacated the premises, conducted a lease-end walk-through of the premises with the landlord's representative, and returned the keys.  The Debtor asserts that it vacated the premises prepetition because it determined that restarting operations at that location would be risky and unprofitable—particularly under the lease renewal terms being sought by Hofer.  Once that decision was effectuated, and the Debtor filed for relief under chapter 11, the Debtor contends that rejection of the Hofer Lease and License was appropriate (to the extent not effectively terminated prepetition) to protect the estate from administrative rent and other expenses for premises that it was not using and did not intend to use.

Hofer objects to the Debtor's decision to reject.  Hofer argues that the Debtor failed to demonstrate that rejection of the Hofer Lease and License is in the interests of the Debtor's estate.  Hofer contends that the premises contain highly customized tenant improvements and that the premises are "likely the only acceptable property in Ventura for the business."  Case Dkt. 33 at 7-8.  Further, Hofer contends that the Debtor has cash in the bank and could elect to operate at the premises under current restrictions, which permit limited indoor operations.  Hofer also questions the Debtor's good faith in commencing the bankruptcy and filing the Motion.  Hofer argues (i) that

---

[3]  The Debtor has commenced an adversary proceeding to determine, *inter alia*, whether and when the Hofer Lease and License terminated.  *See* Adv. No. 9:21-ap-01014-MB.  Nothing in this Memorandum is intended to constitute a ruling on that issue.  Instead, the Court is ruling here only whether to approve Debtor's rejection of the Hofer Lease and License pursuant to Bankruptcy Code section 365(a) and when such rejection should be effective.  If the court determines that the Hofer Lease and License were effectively terminated prepetition, rejection may be of little practical effect.  If, however, the Hofer Lease and License was not terminated prepetition, rejection postpetition will impact the priority and amount of any claim to which Hofer may be entitled. *See* 11 U.S.C. §§ 365(g), 502(b)(6).

1  the Debtor is not actually insolvent, and (ii) it is bad faith to file a case solely for the purpose of

2  rejecting an unexpired lease or executory contract.

3        Hofer does not specifically challenge the retroactive nature of the requested relief or specify

4  a preference between the two alternative rejection approval dates requested by the Debtor: (i) April

5  6, 2021 (the petition date) or (ii) April 7, 2021 (the date the Motion was filed).  Moreover, neither

6  party addresses whether the court's authority to grant retroactive approval of a rejection under

7  Bankruptcy Code section 365(a) has been affected by the Supreme Court's recent decision in

8  *Acevedo Feliciano,* an issue the court addresses below in Section IV.B.

9  ### III.

10  ### JURISDICTION, AUTHORITY & VENUE

11        The court has jurisdiction over the Motion because the Debtor seeks relief expressly

12  provided under a provision of title 11, i.e., Bankruptcy Code section 365.  28 U.S.C. § 1334(b).

13  For the same reason, the Motion gives rise to a statutorily and constitutionally "core" matter, over

14  which the court has the adjudicative authority to enter a final order.  *See Wellness Int'l Network,*

15  *Ltd. v. Sharif,* 575 U.S. 665 (2015).  Venue is proper under 28 U.S.C. § 1409(a).

16  ### IV.

17  ### LEGAL ANALYSIS

18  ### A. Rejection of the Hofer Lease and License

19        Pursuant to Bankruptcy Code section 365(a), a chapter 11 debtor in possession, "subject to

20  the court's approval, may . . . reject any executory contract or unexpired lease of the debtor."  11

21  U.S.C. § 365(a).[4]  "In making its determination, a bankruptcy court need engage in 'only a cursory

22  review of a [debtor in possession]'s decision to reject the contract.  Specifically, a bankruptcy court

23  applies the business judgment rule to evaluate a [debtor in possession]'s rejection decision.'"

24  *Agarawal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.),* 476 F.3d

25

26  _____

27  [4]  The statute states that the "trustee" has this power.  Nevertheless, in chapter 11, the debtor in
   possession has nearly all the rights, powers, functions and duties of a trustee under the Bankruptcy

28  Code.  11 U.S.C. § 1107(a).

665, 670 (9th Cir. 2007) (quoting *Durkin v. Benedor (In re G.I. Indus.)*, 204 F.3d 1276, 1282 (9th Cir. 1999)).

The Ninth Circuit applies the same corporate business judgment rule in bankruptcy that is applicable outside of bankruptcy. *Id.* (citing *Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985)).  "Thus, in evaluating the rejection decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *Id.* (citing authorities).  "It should approve the rejection of an executory contract under §365(a) unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.'" *Id.* (quoting *Lubrizol Enters.*, 756 F.2d at 1047).

On the record before it, the court is unable to conclude that the Debtor's rejection of the Hofer Lease and License was manifestly unreasonable or based on bad faith, whim, or caprice.  On the petition date, the Debtor not only had ceased operations at the premises, but vacated those premises, conducted a walk-through with the landlord, and returned the keys.  Under these circumstances, it makes no business sense *not* to reject the Hofer Lease and License and expose the estate to potential administrative expenses for rent.  This is especially true when there appears to be a dispute between the parties over whether the lease term had been extended.  Pending assumption or rejection of an unexpired nonresidential real property lease, the estate is liable for rent as an administrative expense.  *See* 11 U.S.C. § 365(d)(3).  Rejection eliminates any possibility that administrative rent might accrue, and relegates any resulting damages claim to a prepetition claim, subject to a lease termination damages cap.  *See* 11 U.S.C. §§ 365(g), 502(b)(6).

Hofer's arguments to the contrary lack merit.  Hofer argues that the Motion is not supported by adequate evidence showing that the Debtor's prepetition decision to discontinue future operations at the premises, and to reject the Hofer Lease and License postpetition, made good business sense.  According to Hofer, "[a] proper lease rejection request should include evidence regarding cash flow, rent payments, lease terms and other items necessary to enable the court to apply the business judgment standard." Case Dkt. 33 at 5.  Further, Hofer complains that the

Debtor has not presented evidence demonstrating that it has found an alternative location for its future operations or that the economics of that location are more favorable than those at the existing premises. *Id.*

Hofer's argument improperly turns the applicable legal standard on its head—seeking to place the burden of proof on the Debtor. The Debtor alleges in the Motion that its decision to reject the Hofer Lease and License is in the best interests of its chapter 11 estate and offers a plausible explanation. Under Ninth Circuit law, this entitles the Debtor to a presumption that it made that decision prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate. *See In re Pomona Valley Med. Group, Inc.,* 476 F.3d at 670.

Hofer fails to overcome this presumption. In support of its position, Hofer offers the testimony of Joy F. Harn, an attorney with experience representing cardrooms throughout California. Harn testifies that the COVID-19 pandemic has had an "adverse effect" on the operation of cardrooms in California, but that partial operations are now permitted. Case Dkt. 35 at 2. Harn testifies that a cardroom in Ventura County currently is permitted to operate outside the premises at 50% of applicable capacity limits, and inside the premises at 25% of applicable capacity limits. *Id.* Although subject to an evidentiary objection, Harn's testimony also identifies 22 cardrooms in California that she believes were operating outdoors as of February 2021.[5]

Based on Harn's testimony, Hofer argues that notwithstanding the pandemic, the Debtor could be operating at its former premises and would not need to reject the Hofer Lease and License. *See* Case Dkt. 33 at 5 ("With loosened County and State restrictions, there seems to [be] no reason that the Debtor cannot resume those profitable operations.") But the argument fails for multiple reasons. First, the argument elides over the fact that the Debtor decided not to continue operations at the premises and to vacate those premises *before* this case was filed. The court is not persuaded that it should reconsider those prepetition business decisions. The only question properly before

---

[5]  Because the offered testimony is simply unpersuasive, the Court finds it unnecessary to address the Debtor's evidentiary objection.

1   the court is whether to approve the Debtor's postpetition decision to reject the Hofer Lease and

2   License—given that the Debtor *already* decided prepetition to vacate the premises and not to restart

3   operations at that location.

4       But even if it were appropriate here to evaluate business decisions that preceded the filing

5   of the case, Harn's declaration testimony fails to demonstrate that the Debtor's decision was

6   manifestly unreasonable or made in bad faith.  At best, Harn's testimony establishes that the Debtor

7   *could* be operating at the premises legally.  The evidence offered does not address, let alone

8   establish, that the Debtor could or would necessarily do so profitably, or that the Debtor's

9   preference to avoid the risks and uncertainty presently associated with the health-related

10  restrictions on its operations going forward, was manifestly unreasonable.

11      Moreover, the evidence—such as it is—is controverted by the rebuttal declaration

12  testimony of Patrick Berry, general manager of the Debtor.  Based on the Debtor's experience in

13  2020, reopening for one and one-half months with outdoor gaming, Berry estimated that the Debtor

14  would lose approximately $100,000 per month operating outside, or with limited amounts of guests

15  outside and inside.  Case Dkt. 80 at ¶ 13.  Berry noted that during the Debtor's brief period of

16  outdoor operations, both customers and employees complained about the cold and windy

17  conditions.  Berry stated that future outdoor operations also would require a significant capital

18  outlay by the Debtor, without any guarantee of when the pandemic would end, how long outdoor

19  operations would be necessary, or whether shut-down orders would be re-imposed.  *Id.* [6]

20  Furthermore, the Debtor concluded that its existing premises would not meet its future needs.

21  According to Berry, there is pending legislation that would permit the Debtor to expand the number

22  of card tables it offers, but the current premises are not large enough to accommodate such an

23  expansion.  *Id.* at ¶ 14.  All these facts bolster the Debtor's explanation for discontinuing

24  operations, vacating the premises, and rejecting the Hofer Lease and License.

25

26  ───────────────

27  [6]  Berry's testimony also demonstrates why Harn's statement that there were 22 card rooms
    operating in California in February 2021 was of limited probative value.  Berry points out that there
    are 88 card clubs licensed by the California Gaming Control Commission, meaning that only 25%

28  were then in operation in February 2021.  *Id.* at ¶ 12.  The overwhelming majority were not.

Hofer also argues that the Motion should be denied because the lease rejection decision was made, and Debtor's chapter 11 case was commenced, in bad faith.  As a threshold matter, the court observes that the argument conflates two analytically distinct questions: (i) whether a lease has been rejected in good faith and (ii) whether a chapter 11 case has been filed in bad faith.  These are two separate inquiries that serve two distinct purposes.

In respect of lease rejection, bad faith exists when the decision is made for some purpose other than a reasonable business purpose benefitting the debtor or simply out of caprice or whim. *See In re Pomona Valley Med. Group, Inc.*, 476 F.3d at 670.  If a rejection decision is made in bad faith, the appropriate result is to deny approval of the rejection.  As the foregoing discussion demonstrates, the Debtor's rejection decision was not made in bad faith because it was made in furtherance of the Debtor's business interests and based on reasonable business judgment.

In respect of case commencement, bad faith exists when the filing "seek[s] to achieve objectives outside the legitimate scope of the bankruptcy laws." *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994).  The purpose of the inquiry is to decide whether a bankruptcy case should proceed.  When a petition is filed in bad faith, the court may dismiss the case. *Id.* Thus, if Hofer is convinced that the Debtor filed this case in bad faith, its recourse is to file a motion to dismiss the case for "cause" under Bankruptcy Code section 1112(b).  Hofer does not cite any case authority for the proposition that the court may deny rejection of a *lease* because the *case* was filed in bad faith.

Nevertheless, Hofer fails to demonstrate that the Debtor filed this chapter 11 case in bad faith.  Hofer makes two arguments in this regard: (i) that the Debtor has overstated its liabilities to appear insolvent and in need of bankruptcy relief, and (ii) that the Debtor improperly filed the case solely for the purpose of rejecting the Hofer Lease and License.  Both arguments are unavailing.

Hofer argues the Debtor's liabilities are overstated in its Schedules of Assets and Liabilities ("Schedules") because a substantial portion of the Debtor's indebtedness arises from loans issued under the federal government's Paycheck Prevention Program ("PPP").  The Schedules show $3,061,422 in assets and $3,500,852 in liabilities, of which $3,217,900 is on account of PPP loans.

1  Hofer argues that some or all the PPP loans will be forgiven, rendering the Debtor solvent on a

2  "balance sheet basis," i.e., the stated value of its assets would be greater than its liabilities.

3          But the argument is based on two faulty assumptions.  First, it assumes a debtor must be

4  insolvent to seek relief under chapter 11.  This is wrong.  *Marshall v. Marshall (In re Marshall)*,

5  403 B.R. 668, 685 (C.D. Cal. 2009) ("As a statutory matter, precedent in this and other circuits

6  makes abundantly clear that the Bankruptcy Code has no insolvency requirement."), *aff'd* 721 F.3d

7  1032 (9th Cir. 2013).

8          Second, it assumes that a claim arising from a PPP loan is somehow not a claim because it

9  *may* be forgiven in the future, upon the satisfaction of certain conditions.  This also is incorrect.  A

10  claim is a "right to payment, whether or not such right is reduced to judgment, liquidated,

11  unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

12  secured, or unsecured.  11 U.S.C. § 101(5A).  A debtor must disclose all "claims" on its bankruptcy

13  schedules.  *See* Official Forms 106D and 106E/F.  Absent evidence establishing that the PPP loans

14  had been forgiven *at the time the petition was filed*, there is nothing incorrect about listing them as

15  claims.  That the debt *may* be forgiven makes it no less a claim.  *See SNTL Corp. v. Ctr. Ins. Co.*

16  *(In re SNTL Corp.)*, 571 F.3d 826, 838 (9th Cir. 2009) ("The [Bankruptcy] Code utilizes this

17  'broadest possible definition' of claim to ensure that 'all legal obligations of the debtor, no matter

18  how remote or contingent, will be able to be dealt with in the bankruptcy case.'" (quoting *Cal.*

19  *Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929-30 (9th Cir. 1993)).

20          Hofer's argument that the Debtor filed the case for an improper purpose also fails.  The

21  question of a debtor's good faith "depends on an amalgam of factors and not upon a specific fact."

22  *Marshall v. Marshall (In re Marshall)*, 403 B.R. at 690, *aff'd* 721 F.3d at 1048 (9th Cir. 2013).

23  "[T]he courts may consider any factors which evidence 'an intent to abuse the judicial process and

24  the purposes of the reorganization provisions.'"  *Id.*  The issue presented is whether the debtor is

25  seeking to achieve "objectives outside the legitimate scope of the bankruptcy laws."  *In re Marsch*,

26  36 F.3d at 828.

27          The totality of the circumstances here demonstrates that the Debtor filed this case in good

28  faith.  The Debtor's business has been disrupted by the COVID-19 pandemic.  Its revenues are

1   down 75%.  During this period of disruption, the initial term of its lease expired, and it was not able

2   to negotiate lease terms on which it believed it could operate profitably.  As a result, it vacated the

3   premises and filed a petition for relief under chapter 11.  At present, the Debtor is not operating the

4   Players Casino and is considering where to reestablish its operations.  Moreover, the Schedules

5   reveal that the landlord is not the Debtor's only creditor.  The Schedules show claims against the

6   Debtor held by over 20 creditors and the Debtor's Statement of Financial Affairs reveals three

7   pending lawsuits against the Debtor, one of which is by a Native American tribe seeking to stop the

8   Debtor from operating.  Case Dkt. 1 at 23-31, 40.  Furthermore, there is a disagreement between

9   the Debtor and Hofer about whether the Hofer Lease and License were extended beyond the initial

10  term of the lease.  Under these circumstances, the court finds that the Debtor sought the protection

11  of chapter 11 in good faith, for the purposes of reorganizing its business affairs, addressing its

12  liabilities, and taking advantage of all the tools Congress granted debtors to advance those

13  objectives.[7]

14      **B.  Retroactive Relief**

15      Hofer's arguments in the briefs and oral argument were directed solely to the propriety of

16  the Debtor's rejection decision.  They did not challenge the *nunc pro tunc* or retroactive aspect of

17  the relief requested, i.e., that the Debtor requests the order be effective as of a date prior to its

18  entry—either the petition date or the date the Motion was filed.  Nevertheless, even in the absence

19  of an objection, a court may properly question whether it has the legal authority to grant relief that

20  is requested of it.  *See Sol. Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 547 B.R. 831,

21  833-34 (Bankr. C.D. Cal. 2016) (court has an independent duty to examine both its jurisdiction and

22  its authority).

23

24  _____

25  [7]  To the extent Hofer argues that it is *per se* inappropriate for the Debtor to file bankruptcy to take
    advantage of rejection under Bankruptcy Code section 365(a), the relegation of any damages claim

26  to the status of a prepetition claim under Bankruptcy Code section 365(g), or the statutory cap on
    the allowed amount of any such claim under section 502(b)(6), its argument is without merit.  *See*

27  *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074-75
    (9th Cir. 2002) (not per se bad faith to propose a plan that denied a creditor postpetition interest at

28  the default rate when doing so was permitted by the Bankruptcy Code).

The authority of bankruptcy courts to grant retroactive effect to the rejection of a nonresidential real property lease has been settled law in the Ninth Circuit since 2004. *See Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064 (9th Cir. 2004). In 2020, however, the United States Supreme Court decided *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696, in which it rejected the attempt of a federal district court to retroactively confer jurisdiction over a matter on the territorial courts of Puerto Rico by entering a *nunc pro tunc* remand order.

The *Acevedo Feliciano* decision does not address rejection or any other relief under the Bankruptcy Code but has been the subject of much discussion in the bankruptcy world. This is because *nunc pro tunc* or retroactive orders are common in bankruptcy. Among other things, they are available, under appropriate circumstances, with respect to the rejection of unexpired nonresidential real property leases, employment of estate professionals, annulment of the automatic stay, and approval of the incurrence of debt.

The Supreme Court's criticism of the *nunc pro tunc* order at issue in *Acevedo Feliciano* has led some to question whether bankruptcy courts continue to have the authority to enter *nunc pro tunc* orders. The court examines this issue below, in the context of the relief requested in the Motion, and concludes that *Acevedo Feliciano* has not affected its authority to grant *nunc pro tunc* relief. Further, the court explains below why that relief is appropriate here.

### 1. Ninth Circuit Law on Retroactive Rejection

In *In re At Home Corp,* the debtor sought rejection under Bankruptcy Code section 365(a) of two unexpired, nonresidential real property property leases, *nunc pro tunc* to the date on which the rejection motion was filed. *In re At Home Corp.*, 392 F.3d at 1066. The debtor had never occupied the premises and filed its motion on the same day it filed its voluntary chapter 11 petition. *Id.* The lessor did not quarrel with the debtor's decision to reject but did object to the motion "'to the extent it seeks retroactive rejection of the leases.'" *Id.* The parties contested this issue because the effective date of the rejection would affect whether the debtor owed the landlord an additional $1 million in rent, payable as an administrative expense. *Id.*

The bankruptcy court held that a *nunc pro tunc* order was appropriate under the circumstances because: (1) the debtor had moved to reject immediately after filing its petition, (2) the debtor set the matter for hearing promptly, (3) the debtor was "not in possession of the premises," and (4) it appeared the landlord's sole reason for opposing *nunc pro tunc* relief was to run up the amount of administrative rent. *Id.* The lessor appealed to the district court, which affirmed. The lessor then appealed to the Ninth Circuit Court of Appeals.

On appeal, the landlord agreed as a general matter that the bankruptcy court had discretion to approve the rejection of the nonresidential real property leases retroactively but argued (i) the bankruptcy court lacked authority to approve rejection as of a date *before* the date on which the landlord regained possession of the premises, and (ii) the bankruptcy court considered the wrong factors in rendering its decision. In addressing these arguments, the court of appeals set out to "identify the authority for, and the limits of, a bankruptcy court's discretion in this context." *Id.* at 1067.

The Ninth Circuit found that authority under Bankruptcy Code sections 105(a), 365(d)(3) and 365(d)(4). *Id.* at 1067-71. Section 105(a) provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 365(d)(3) provides that a debtor in possession must continue to pay rent and perform all other obligations under a nonresidential real property lease until it assumes or rejects the lease under section 365(a). 11 U.S.C. § 365(d)(3). Section 365(d)(4) provides a debtor in possession 60 days to make that decision unless that period is extended by the court. 11 U.S.C. § 365(d)(4). If a debtor in possession does not timely assume or reject the lease, the lease is "deemed rejected" and the debtor in possession is required to "immediately surrender such nonresidential real property to the lessor." *Id.*

None of these statutes mentions "retroactive rejection." But the court concluded that the exercise of retroactive rejection nevertheless may be "necessary or appropriate" to carry out the objectives of sections 365(d)(3) and (d)(4)—statutes adopted by Congress as part of the so-called "Shopping Center Amendments" in 1984. *Id.* at 1068 (citing the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984)), 1071. The court

observed that these statutes were adopted to address two problems: (1) the "long-term vacancy or partial operation of space by a bankrupt tenant," whose control of the premises was protected by the automatic stay, and (2) the failure of the trustee or debtor in possession to pay rent after vacating the premises but prior to its decision to assume or reject. *Id.* "By requiring the tenant to pay administrative rent until it rejects the lease, and by providing for automatic rejection of the lease after 60 days, the Amendments ensure that the tenant determines promptly whether to assume or reject the lease, rather than taking advantage of the automatic stay." *Id.* at 1069.

Because the enactment of section 365(d)(3) made tenants liable for rent accruing until the assumption or rejection of a lease, courts began to hear more disputes over the question of exactly *when* a rejection under section 365(a) is effective. A "majority" of courts held that rejection is effective upon entry of a court order approving the motion to reject. *Id.* (*citing authorities*). A "minority" of courts held that rejection is effective upon the filing of the motion. *Id.* (citing *In re Joseph C. Spies Co.,* 145 B.R. 597, 601 (Bankr. N.D. Ill. 1992)). In an effort to reconcile these views, the First Circuit Court of Appeals held in *Thinking Machs. Corp. v. Mellon Find. Servs. Corp. (In re Thinking Machs. Corp.),* 67 F.3d 1021, 1029 (1st Cir. 1995) that "rejection under section 365(a) does not take effect until judicial approval is secured, but the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively." *In re At Home Corp.*, 392 F.3d at 1069 (quoting *In re Thinking Machs. Corp.*, 67 F.3d at 1029).

Following and expounding on the decision in *In re Thinking Machs. Corp.,* the Ninth Circuit concluded in *In re At Home Corp.* that "a bankruptcy court, in exercising its equitable powers under 11 U.S.C. § 105(a), may approve the retroactive rejection of a nonresidential lease when 'necessary or appropriate carry out the provisions of' of §365(d)." 392 F.3d at 1071. The court reasoned that retroactive rejection may, in appropriate cases, further the objectives of Bankruptcy Code sections 365(d)(3) and (d)(4) to "remedy the 'long-term vacancy' of leased premises during protracted bankruptcy proceedings" and "force the debtor-tenant to decide quickly whether to assume or reject an unexpired non-residential lease." *Id.* at 1070 (citing 1984 U.S.C.C.A.N. at 598-99). The court noted the First Circuit's observation that retroactive rejection has the "'salutary side effect' of acting 'as a stimulus to all parties to cooperate in getting the

1   trustee's motion to reject heard and determined at the earliest practicable date.'"  *Id.* (quoting *In re*

2   *Thinking Machs. Corp.*, 67 F.3d at 1028).

3        The Ninth Circuit explained that this is particularly true because "courts generally focus on

4   whether parties have facilitated or hindered the prompt return of the leased premises to the landlord

5   when deciding whether to approve the rejection of a lease retroactive to an earlier date." *Id.*  To

6   illustrate this point, the court of appeals cited favorably the decision in *In re Amber's Stores, Inc.*,

7   193 B.R. 819 (Bankr. N.D. Tex. 1996).  In that case, the bankruptcy court approved the rejection of

8   a lease *nunc pro tunc* to the motion filing date because the debtor-tenant "had turned over the keys

9   and vacated the premises pre-petition, and served a motion to reject the lease as soon as possible.'"

10  *In re Amber's Stores, Inc.*, 193 B.R. at 827.  The Ninth Circuit observed that "[b]y so doing, the

11  debtor had acted to further the intended purposes of § 365(d): the prompt rejection of the lease and

12  the return of the leased premises to the landlord's possession."  *In re At Home Corp.*, 392 F.3d at

13  1070-71.

14       Accordingly, the Ninth Circuit rejected the landlord's argument that the bankruptcy court

15  had exceeded its equitable powers by approving the lease rejection as of a date when the debtor

16  remained in possession of the premises.  The court reasoned that the landlord's position "would

17  deprive a bankruptcy court of flexibility in molding its orders to reflect the circumstances and the

18  actions of both parties to the lease." *Id.* at 1072.  The court "decline[d] to hamstring bankruptcy

19  courts in this way." *Id.*  Instead, the court concluded that because nothing in section 365 prohibits a

20  bankruptcy court from selecting a retroactive rejection date, the specific exercise of that power

21  ought to be committed to the sound discretion of the bankruptcy court.  *See id.* (citing cases

22  applying an abuse of discretion standard).

23       Applying this standard, the Ninth Circuit concluded that the bankruptcy court had not

24  abused its discretion in making the rejection effective as of the motion filing date because: (i) the

25  motion was filed immediately on the petition date, (ii) the debtor acted promptly in seeking a

26  hearing on the motion, (iii) the debtor never occupied the premises, and (iv) the bankruptcy court

27  was convinced that the landlord's motivation in opposing rejection was to increase the amount of

28

1  administrative rent rather than a concern for its indisputable right to start re-letting the premises as

2  quickly as possible. *Id.* at 1072-75.

3         **2.** ***Acevedo Feliciano* Decision and *Nunc Pro Tunc* Relief Generally**

4        In 2016, certain active and retired Catholic school employees, who were beneficiaries of a

5  pension plan created for their benefit by the Archdiocese of Puerto Rico, filed suit over the

6  termination of that trust in the Court of First Instance of Puerto Rico. *See Roman Catholic*

7  *Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. at 697-98.  During the pendency of the

8  litigation, the trust filed a chapter 11 case in the Bankruptcy Court for the District of Puerto Rico,

9  and the Archdiocese removed the litigation to the District Court for the District of Puerto Rico,

10 arguing that the litigation was "related to" the bankruptcy case. *Id.* at 699-700.  The bankruptcy

11 court subsequently dismissed the trust's chapter 11 case and the litigation resumed in the Court of

12 First Instance.

13       The problem was that the district court did not enter an order remanding the litigation to the

14 Court of First Instance until five months after the litigation resumed there.  During that period, the

15 Court of First Instance entered certain payment and asset seizure orders.  The district court

16 attempted to address this oversight by entering a remand order *nunc pro tunc* to the date the

17 bankruptcy case was dismissed.  But the Supreme Court rejected this effort.  The Supreme Court

18 held (1) the Court of First Instance was without jurisdiction to enter the subject orders because they

19 were entered before the district court had actually remanded the case and (2) a *nunc pro tunc* order

20 could not be used to remedy this deficiency. *Id.* at 700-01.  The Supreme Court explained as

21 follows:

22       Federal courts may issue nunc pro tunc orders, or "now for then" orders,

23     Black's Law Dictionary, at 1287, to "reflect[ ] the reality" of what has already

24     occurred, *Missouri v. Jenkins*, 495 U. S. 33, 49, 110 S. Ct. 1651, 109 L. Ed. 2d 31

25     (1990). "Such a decree presupposes a decree allowed, or ordered, but not entered,

26     through inadvertence of the court." *Cuebas y Arredondo v. Cuebas y Arredondo*,

27     223 U. S. 376, 390, 32 S. Ct. 277, 56 L. Ed. 476 (1912).

28

1    Put colorfully, "[n]unc pro tunc orders are not some Orwellian vehicle for

2    revisionist history—creating 'facts' that never occurred in fact." *United States v.*

3    *Gillespie*, 666 F. Supp. 1137, 1139 (ND Ill. 1987). Put plainly, the court "cannot

4    make the record what it is not." *Jenkins*, 495 U. S., at 49.

5    Nothing occurred in the District Court case on March 13, 2018. See Order

6    Granting Motion to Remand in No. 3:18-cv-01060 (noting, on August 20, 2018, that

7    the motion is "hereby" granted and ordering judgment "accordingly"). March 13

8    was when the Bankruptcy Court dismissed the Trust's proceeding and thus the day

9    that the Archdiocese's argument for federal jurisdiction lost its persuasive force.

10    Even so, the case remained in federal court until that court, on August 20, reached a

11    decision about the motion to remand that was pending before it. The Court of First

12    Instance's actions in the interim, including the payment and seizure orders, are void.

13    *Id.*

14    The Supreme Court's decision in *Acevedo Feliciano* has led some bankruptcy courts to

15    believe there has been a significant shift in the law of *nunc pro tunc* relief and/or to question the

16    continued practice of *nunc pro tunc* relief in bankruptcy.  *See, e.g., In re Miller,* 620 B.R. 637, 641

17    (Bankr. E.D. Cal. 2020) ("*Acevedo's* significant limit on the use by federal courts of *nunc pro tunc*

18    orders has necessitated a change in bankruptcy practice.") (rejecting *nunc pro tunc* approval of

19    employment of estate professionals); *Zvoch v. Winnecour (In re Zvoch),* 618 B.R. 734, 740 (Bankr.

20    W.D. Pa. 2020) ("the Court doubts that this kind of retroactive relief is still cognizable after the

21    United States Supreme Court's ruling in *Roman Catholic Archdiocese of San Juan, Puerto Rico v.*

22    *Acevedo Feliciano*") (denying retroactive approval of financing entered into by chapter 13 debtor);

23    *In re Telles,* No. 8-20-70325-reg, 2020 Bankr. LEXIS 1167, at *14-15 (Bankr. E.D.N.Y. Apr. 30,

24    2020) ("The landscape of the law is different post-*Acevedo*, and this Court is bound to follow the

25    precedent set by the Supreme Court.") (rejecting retroactive annulment of the automatic stay); *In re*

26    *Benitez*, No. 8-19-70230-reg, 2020 Bankr. LEXIS 661, at *3 (Bankr. E.D.N.Y. Mar. 13, 2020)

27    ("The holding in *Acevedo* raises serious questions about the use of *nunc pro tunc* relief for purposes

28

16

other than to reflect an event that has already occurred but is not accurately reflected in the court's records") (rejecting *nunc pro tunc* approval of employment of estate professionals).

Viewed in the broader context of the Supreme Court's *nunc pro tunc* jurisprudence, however, the *Acevedo Feliciano* decision does not change existing law or introduce a new limitation on the *nunc pro tunc* powers of courts.  To the contrary, this *per curiam* (unsigned) opinion simply applies a longstanding limitation on that power: i.e., that it may not be used to create jurisdiction retroactively.

A *nunc pro tunc* order involves the entry of "a judgment or a decree as of a date anterior to that on which it was in fact rendered."  *Mitchell v. Overman*, 103 U.S. 62, 64-65 (1880). "Translated as 'now for then,' it is an ancient tool of equity designed to give retroactive effect to the order of a court."  *Sierra Club v. Whitman*, 285 F.3d 63, 67 (D.C. Cir. 2002); *see also Iouri v. Ashcroft,* 487 F.3d 76, 87 (2nd Cir. 2007) (citing Black's Law Dictionary 1100 (8th Ed. 2004)).  It traditionally has been available in those "circumstances, where its entry is necessary to avoid, [rather than] create, an injustice at the hands of the court itself."  *Weil v. Markowitz*, 898 F.2d 198, 201 (D.C. Cir. 1990).

The Supreme Court has recognized two broad categories in which this equitable power may be exercised.  First, the Supreme Court has held that *nunc pro tunc* relief may be used to remedy delays resulting from the judicial process that are not attributable to the unreasonable delay of the parties:

> [T]he rule established by the general concurrence of the American and English
> courts is, that where the delay in rendering a judgment or a decree arises from the
> act of the court, that is, where the delay has been caused either for its convenience,
> or by the multiplicity or press of business, either the intricacy of the questions
> involved, or of any other cause not attributable to the laches of the parties, the
> judgment or the decree may be entered retrospectively, as of a time when it should
> or might have been entered up.  In such cases, upon the maxim *actus curiae*

1      *neminem gravabit*,[8] — which has been well said to be founded in right and good

2      sense, and to afford a safe and certain guide for the administration of justice, — it is

3      the duty of the court to see that the parties shall not suffer by the delay.  A *nunc pro*

4      *tunc* order should be granted or refused, as justice may require in view of the

5      circumstances of the particular case.

6  *Mitchell v. Overman*, 103 U.S. at 64-65.  Based on the foregoing, the Supreme Court held in

7  *Mitchell* that when a litigant died during the pendency of the litigation, it was appropriate to deem

8  the relief effective as of the last day of the trial court's term when the litigant was still alive and the

9  matter submitted for decision.  *Id.*  Doing so preserved the vitality of the decision notwithstanding

10 the intervening death of the litigant.  *See Bell v. Bell*, 181 U.S. 175, 178-79 (1900).

11      Lower courts have relied on *Mitchell* to grant *nunc pro tunc* relief in a variety of other

12 circumstances.  *See, e.g., Edwards v. I.N.S.*, 393 F.3d 299, 310-12 (2d Cir. 2004) (*nunc pro tunc*

13 relief appropriate to remedy erroneous denial of petition for relief from deportation by Bureau of

14 Immigration Appeals when, during the pendency of the appeal, aliens accrued more than five years'

15 imprisonment, which otherwise would have disqualified them from contesting deportation); *Cont'l*

16 *Cas. Co. v. Gen. Dev. Corp. (In re Gen. Dev. Corp.)*, 165 B.R. 685 (S.D. Fla. 1994) (affirming

17 bankruptcy court order vacating and "re-approving" settlement agreement *nunc pro tunc* to the date

18 on which it originally was approved after considering due process arguments challenging its

19 original approval); *In re Pago Pago Aircrash*, 525 F. Supp. 1007, 1024 (C.D. Cal. 1981) (court had

20 the inherent authority to remedy delays resulting from the administration of multi-district tort

21 litigation by making each judgment effective, for purposes of calculating post-judgment interest, as

22 of the date each jury verdict was rendered); *In re Swain*, 243 F. 781, 782 (D. Mass. 1917) (treating

23 petition for bankruptcy discharge under prior Bankruptcy Act as timely filed when the petitioner

24 was "prevented" from doing so by court clerk).

25

26

27

28
─────────────────────

[8]  "An act of the court shall prejudice no man.  Where a delay in an action is the act of the court, neither party shall suffer for it."  Black's Law Dictionary (6th ed. 1990) at 36.

Second, the Supreme Court has held that *nunc pro tunc* relief may be used to retroactively correct or supplement a court's record. *See, e.g., Missouri v. Jenkins*, 495 U.S. 33, 49-50 (1989) (court of appeals permitted to retroactively correct its order denying rehearing en banc to add denial of petition for rehearing, thereby reflecting what had actually occurred); *Bernards v. Johnson*, 314 U.S. 19, 22 n.4 (1941) (noting *nunc pro tunc* entry of order previously made but not timely entered on docket, as confirmed by the clerk's notes and recollection of the judge); *Coder v. Arts*, 213 U.S. 223, 237 (1909) (court of appeals allowed to make findings and conclusions retroactive to judgment date when they were filed within the appeals period); *Supervisors v. Durant*, 76 U.S. 736, 737 (1869) (permitting *nunc pro tunc* correction of trial court's journal and marshal's return when omissions arose through inadvertence and were related to common practices).

This use of the *nunc pro tunc* power, however, is not without limits. As the Supreme Court has explained, "[t]he power to amend its records, to correct mistakes of the clerk or other officer of the court, inadvertencies of counsel, or to supply defects or omissions in the record, even after the lapse of the term, is inherent in courts of justice. . . ." *Gagnon v. United States*, 193 U.S. 451, 456 (1904). But it "must not be confounded with the power to create. It presupposes an existing record, which is defective by reason of some clerical error or mistake, or the omission or some entry which should have been made during the progress of the case, or by the loss of some document originally filed therein." *Id.* at 457. Thus, in *Gagnon*, the Supreme Court upheld a collateral attack on a *nunc pro tunc* judgment of naturalization—entered over 30 years after plaintiff allegedly was naturalized—because there was no evidence establishing that an order actually had been entered at the time.

Consistent with the notion that a court cannot "create" a record that does not exist, *id.* at 456, and "cannot make the record what it is not," *Missouri v. Jenkins*, 495 U.S. at 49-50, the Supreme Court repeatedly has rejected use of *nunc pro tunc* relief to remedy a failure of jurisdiction: i.e., to pretend that a prerequisite to jurisdiction was timely in existence when, in fact, it was not. *See, e.g., Maney v. United States,* 278 U.S. 17, 21-23 (1928) (when attachment of a certificate of arrival was a prerequisite to district court's authority to grant petition for naturalization, court could not use a *nunc pro tunc* order to treat a subsequently filed certificate as

having been attached to the previously filed petition); *Fleischmann Constr. Co. v. United States*, 270 U.S. 349, 354-57 (1925) (alleged trial court errors were not reviewable when appellant had failed to object at trial notwithstanding district court's *nunc pro tunc* order suggesting those objections had timely been made); *Cuebas y Arredondo v. Cuebas y Arredondo*, 223 U.S. at 388-89 (because court was without subject matter jurisdiction at the time it entered *pro confesso* order against defendant, it could not enter a final decree based on that order; *nunc pro tunc* relief would not remedy the jurisdictional infirmity); *Old Nick Williams Co. v. United States*, 215 U.S. 541, 541-45 (1909) (*nunc pro tunc* order granting writ of error as if it had been timely filed was ineffective to extend the time to appeal); *Credit Co. v. Arkansas C. R. Co.*, 128 U.S. 258, 258-61 (1888) (when papers necessary to prosecute appeal were filed 5 days late, *nunc pro tunc* order deeming them timely filed was ineffective).

The Supreme Court's decision in *Acevedo Feliciano* falls squarely within the Court's long line of authority holding that *nunc pro tunc* relief may not be used to pretend that a jurisdictional fact existed at a time when it did not actually exist. This unsigned opinion does not announce any new principle of law or any new limitation on the *nunc pro tunc* power. Indeed, by relying on *Missouri v. Jenkins*, in which the Supreme Court permitted *nunc pro tunc* relief, the *Acevedo Feliciano* decision actually reaffirms the availability of this relief in appropriate circumstances. Moreover, *Acevedo Feliciano* does not cite or overrule the Supreme Court's decision in *Mitchell v. Overman*, which remains good law. *Mitchell* and its progeny demonstrate that the *nunc pro tunc* power is a time-honored equitable tool, with broader application than the mere correction of errors in the record of a proceeding. Thus, although *nunc pro tunc* relief may not be used as "some Orwellian vehicle for revisionist history," *Acevedo Feliciano*, 140 S. Ct. at 700, it remains available as a powerful tool to achieve justice under appropriate circumstances.

* * *

Against this backdrop, the court now turns to the question of whether the holding of *Acevedo Feliciano* disturbs the well-settled Ninth Circuit precedent that permits *nunc pro tunc* or retroactive rejection of unexpired, nonresidential real property leases under Bankruptcy Code section 365.

### 3.  The Impact of *Acevedo Feliciano* on Retroactive Lease Rejection

As noted, a three-judge panel of the Ninth Circuit Court of Appeals previously held in a precedential opinion that a bankruptcy court "has the equitable power, in suitable cases, to order a rejection to operate retroactively" and that "the retroactive date may be earlier than the date on which the landlord retakes possession of the premises." *In re At Home Corp.*, 392 F.3d at 1065. The question presented is whether this precedent remains binding after *Acevedo Feliciano.*

As a general matter, this court is bound by the decisions of Ninth Circuit panels, unless the decision is overruled by the Ninth Circuit, sitting en banc, or by the Supreme Court.  *See Hart v. Massanari*, 266 F.3d 1155, 1170-71 (Put bluntly, [Ninth Circuit] "caselaw on point *is* the law."). The court may reexamine the holding of a Ninth Circuit decision "in light of an inconsistent decision by" the Supreme Court "on a closely related, but not identical issue," but only when the Supreme Court decision has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).

Ninth Circuit precedent remains binding on this court "if it can be reasonably harmonized with the intervening authority." *Lair v. Bullock*, 697 F.3d 1200, 1206 (9th Cir. 2012) (citation omitted).  "It is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent. The intervening higher precedent must be 'clearly inconsistent' with the prior circuit precedent." *Id.* at 1207 (citations omitted).

Applying these principles, the court concludes that the binding precedent of *In re At Home Corp.*, which authorizes *nunc pro tunc* approval of a nonresidential lease rejection under Bankruptcy Code section 365(a), is undisturbed by the Supreme Court's decision in *Acevedo Feliciano.*

As a threshold matter, the opinion in *Acevedo Feliciano* does not announce any new rule of law.  As demonstrated in Section IV.B.2, this short, unsigned opinion applies a well-established limitation on the inherent powers of a court to use *nunc pro tunc* relief: i.e., a court may not use it to create jurisdictional facts that did not exist at the relevant time.  This limitation is reflected in

1    Supreme Court precedents going back over 100 years.  This court must assume that when the Ninth

2    Circuit decided *In re At Home Corp.*: (1) it did so with knowledge of these precedents and (2) it

3    concluded that they were not relevant to its analysis.  It would be presumptuous—to say the least—

4    for this court to assume otherwise.

5            Even so, the decision in *Acevedo Feliciano* is not clearly inconsistent and is readily

6    reconciled with the decision in *In re At Home Corp.*

7            First, the *nunc pro tunc* approval of a lease rejection under Bankruptcy Code section 365(a)

8    does not involve the issue at the heart of *Acevedo Feliciano*: the retroactive creation of jurisdiction

9    at a time when none existed.  *See Merriman v. Fattorini (In re Merriman)*, 626 B.R. 381, 392-94

10   (9th Cir. B.A.P. 2020) (holding *Acevedo Feliciano* does not alter bankruptcy court's power to annul

11   the automatic stay retroactively because such power does not involve the creation of jurisdiction);

12   *In re Hunanyan*, 631 B.R. 904, 908 (holding *Acevedo Feliciano* does not alter bankruptcy court's

13   power to approve professional employment retroactively for the same reason).  The bankruptcy

14   court's jurisdiction over an unexpired nonresidential real property lease of the debtor arises upon

15   the commencement of the case.  *See* 11 U.S.C. § 541(a) (estate created upon case commencement

16   comprising all legal and equitable interests of the debtor); 28 U.S.C. § 1334(e) (court has

17   jurisdiction over all property of the debtor and of the estate).  Whether there are equitable

18   circumstances to justify retroactive rejection does not affect the court's jurisdiction.

19           Second, unlike the *nunc pro tunc* power exercised in *Acevedo Feliciano*, the equitable

20   power to retroactively approve a nonresidential lease rejection is inextricably rooted in the

21   Bankruptcy Code.  The Ninth Circuit held in *In re At Home Corp.* that retroactive lease rejection is

22   an equitable power authorized by Bankruptcy Code section 105(a) because, in appropriate

23   circumstances, it may be "necessary or appropriate to carry out" the provisions of Bankruptcy Code

24   section 365(d).  *See* 392 F.3d at 1070-71.  In *Acevedo Feliciano*, the Supreme Court dealt

25   exclusively with the district court's inherent power to enter a *nunc pro tunc* order generally, not

26   pursuant to a grant of statutory authority.  There is nothing in that decision addressing the

27   legislatively granted powers of the bankruptcy court to grant orders that are "necessary and

28   appropriate to carry out" provisions of the Bankruptcy Code, including section 365.  *See* 11 U.S.C.

1 § 105(a).  For these reasons, the court cannot conclude that the decision in *Acevedo Feliciano*

2 "undercut the theory or reasoning underlying [*In re At Home Corp.*] in such a way that the cases are

3 clearly irreconcilable."  *Miller v. Gammie*, 335 F.3d at 899-900.

4        Third, even if the scope of *Acevedo Feliciano* is read more broadly, its reasoning does not

5 preclude *nunc pro tunc* approval of a nonresidential lease rejection.  Granting retroactive rejection,

6 under circumstances that make it equitable to do so, does not involve "revisionist history" or the

7 "creat[ion of] 'facts' that never occurred in fact."  *Acevedo Feliciano*, 140 S. Ct. at 701.  The Ninth

8 Circuit has observed that courts considering *nunc pro tunc* lease rejection "generally focus on

9 whether parties have facilitated or hindered the prompt return of the leased premises to the landlord

10 when deciding whether to approve the rejection of a lease retroactive to an earlier date."  *In re At*

11 *Home Corp.*, 392 F.3d at 1071.  In other words, courts look to what *actually* happened to determine

12 when the legal consequences of rejection (i.e., the termination of administrative rent accrual)

13 should justly begin.  They do not rewrite history.  *See In re Hunanyan*, 631 B.R. at 913 (even when

14 approval of the employment of a professional is delayed and later granted retroactively "the

15 employment itself was not a fiction").  Retroactive rejection, therefore, does not run afoul of

16 *Acevedo Feliciano.*[9]

17        Finally, the *nunc pro tunc* approval of a lease rejection is consistent with the Supreme

18 Court's decision in *Mitchell v. Overman*, 103 U.S. 62 (1880), discussed in greater detail above in

19 Section IV.B.2.  *Mitchell* illustrates that the inherent power of courts to grant *nunc pro tunc* relief is

20 not limited to correcting the record in a case to reflect something that occurred but was not

21 recorded.  *Mitchell* stands for the proposition that *nunc pro tunc* relief may be used to remedy

22 delays resulting from the judicial process that are not attributable to the unreasonable delay of the

23

24

25

26 [9]  All *nunc pro tunc* relief, by its nature, engages in a legal fiction.. *See Parker v. Ellis*, 362 U.S. 574, 598, 80 S. Ct. 909, 922-23 (1960) (Douglas, J., dissenting) ("Any judgment *nunc pro tunc* indulges in a fiction. But it is a useful one, advancing the ends of justice.")

27 The recognition by *Acevedo Feliciano* that certain applications of the *nunc pro tunc* power are not appropriate does not mean that all uses of that power—or the legal fictions that result—are

28 inappropriate.

1  parties. *See Mitchell v. Overman*, 103 U.S. at 64-65. That is precisely what retroactive lease

2  rejection achieves.

3      A trustee or debtor in possession can move swiftly to vacate leased premises and return

4  them to the landlord but cannot obtain the immediate entry of order from the bankruptcy court

5  approving its decision to reject the lease—which is the event that terminates the accrual of

6  administrative rent. *See In re At Home Corp.*, 392 F.3d 1068-69. The party requesting rejection

7  must file a motion seeking such an order and provide adequate notice of the motion to the landlord

8  and other parties in interest. *See* 11 U.S.C. § 365(a); Fed. R. Bankr. P. 6006, 9013, 9014. Under

9  the applicable federal rule, such notice must be made at least seven days before the hearing on the

10 motion, Fed. R. Bankr. P. 9006(d), and under the local rules of this court, generally must be made

11 21 days before such hearing. LBR 9013-1(d). Even if this notice period is shortened, it typically

12 cannot be eliminated. Moreover, there can be additional delays attendant to the entry of an order

13 by the court clerk. *Nunc pro tunc* approval of a lease rejection addresses these problems and

14 enables the bankruptcy court, under circumstances where the moving party has acted diligently and

15 equitably, to ameliorate the delay caused by the judicial approval process.

16      For all these reasons, the court concludes that the Ninth Circuit's recognition of retroactive

17 lease rejection in *In re At Home Corp.* remains binding on this court, notwithstanding the Supreme

18 Court's decision in *Acevedo Feliciano*.

19              **4.  Retroactive Rejection in the Case at Bar**

20      Based on the totality of the circumstances, the court finds that it would be equitable and

21 appropriate to approve Debtor's rejection of the Hofer Lease and License *nunc pro tunc* to April 7,

22 2021. It is undisputed that on March 31, 2021, the Debtor vacated the premises, conducted a lease-

23 end walk-through with the landlord's representative, and returned the keys. The Debtor

24 commenced its chapter 11 case on April 6, 2021, and filed and served its Motion requesting

25 approval of its decision to reject on the following day. On this record, the court finds that the

26 Debtor acted diligently, and that rejection of the lease should be approved *nunc pro tunc*. Although

27 the Debtor requested, in the alternative, rejection effective as of the petition date, and the court

28 originally was inclined to use that date, the court is not persuaded that this is the appropriate date.

1  The date on which the Debtor filed and served the Motion is the date on which it communicated its

2  unequivocal intention to reject the Hofer Lease and License under Bankruptcy Code section 365(a).

3  Of the two possible dates, the Court concludes that the date on which the Motion was filed, April 7,

4  2021, is the most appropriate.

**V.**

**CONCLUSION**

For all of the foregoing reasons, the court concludes that the Motion should be granted,

approving the rejection of the Hofer Lease and License *nunc pro tunc* to the date on which the

Motion was filed, April 7, 2021.  The court will enter a separate order granting the Motion.

Date: February 4, 2022

Martin R Barash
United States Bankruptcy Judge